## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **SHONITA L. TAYLOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:04cv960-IDM** |
| | ) | **(WO)** |
| **CSX TRANSPORTATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Before the court is Defendant CSX Transportation's ("CSXT") motion for summary judgment, filed October 10, 2005. A brief and an evidentiary submission accompany the motion. Plaintiff Shonita L. Taylor ("Ms. Taylor") submitted a memorandum in response and an evidentiary submission on November 7. Thereafter, on November 14, CSXT filed a reply.[1]

CSXT moves for summary judgment on Ms. Taylor's claims for sexual harassment and retaliation brought pursuant to 42 U.S.C. § 1981 ("§ 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII"), and her state law claim for intentional infliction of emotional distress. Her federal civil rights claims are premised on allegations that, during her employment with CSXT, Ms. Taylor's

---

[1] CSXT's motion for summary judgment and related pleadings were filed in Killebrew v. CSXT, Civ. A. No. 2:03cv943-IDM, with which the above-styled lawsuit previously was consolidated, and were assigned document numbers by the clerk. (See Doc. Nos. 151, 152, 155 and 156). The court refers to those document numbers herein.

supervisor, Cedric Killebrew ("Mr. Killebrew"), sexually harassed her and that,

thereafter, CSXT subjected her to adverse employment actions, including termination, in

retaliation for complaining to management about the sexual harassment.  After careful

consideration of the arguments of counsel, the relevant law and the record as a whole, the

court finds that summary judgment is due to be entered in CSXT's favor on Ms. Taylor's

federal claims under § 1981 and Title VII and that Ms. Taylor's state law claim is due to

be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant

to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights

jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).  The parties do not

contest personal jurisdiction or venue, and the court finds adequate allegations of both.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence

and make factual inferences in the light most favorable to the nonmoving party.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S.H. Kress & Co., 398

U.S. 144, 157 (1970).  Summary judgment is entered only if it is shown "that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  At this juncture, the court does not "weigh the

2

evidence and determine the truth of the matter," but solely "determine[s] whether there is

a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

(citations omitted).  This determination involves applying substantive law to the

substantive facts that have been developed.  A dispute about a material fact is genuine if a

reasonable jury could return a verdict for the nonmoving party, based on the applicable

law in relation to the evidence developed.  See id. at 248; Barfield v. Brierton, 883 F.2d

923, 933 (11th Cir. 1989).

The moving party bears the initial burden of establishing the absence of a genuine

issue of material fact.  See Celotex, 477 U.S. at 323.  The burden then shifts to the

non-moving party, which "must do more than simply show that there is some

metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving

party.  See id. at 587.


## IV.  STATEMENT OF FACTS[2]

CSXT, based in Jacksonville, Florida, is a railroad transportation company which

serves the eastern United States and Canada.  It employs approximately 37,000

---

[2] When deciding a motion for summary judgment, the court views the facts and all
reasonable inferences in favor of the nonmoving party.  See Celotex, 477 U.S. at 322.
This statement of facts, thus, may not represent the actual facts.

3

individuals, the majority of whom are union employees covered by collective bargaining agreements.  (Ex. 2 to Doc. No. 155.)  On or about April 8, 2003, Ms. Taylor began working at CSXT as an "extra board clerk" at its terminal in Montgomery, Alabama. (Ms. Taylor Dep. at 35 (Ex. C to Doc. No. 150); (Ms. Taylor Aff. ¶ 1 (Ex. 1 to Doc. No. 155)); (Compl. ¶ 8.)  The extra-board clerk job is a union position governed by a collective bargaining agreement.  (Ex. 2 to Doc. No. 155.)  In this position, Ms. Taylor fills in when the regular clerks are on vacation, sick leave, or leave of absence.  (Id.) While she does not have a set work schedule, Ms. Taylor receives a weekly "guaranteed rate of pay," even if she is not called in to work, so long as she agrees to be available at any hour during a specified seven-day period.  (Ms. Taylor Dep. at 36.)  Ms. Taylor's duties include performing general clerical activities and transporting train crews to and from their trains.  (Id. at 44.)  Ms. Taylor indicates that "normally" she works on the "night shift."  (Id. at 103.)

Ms. Taylor admits that, in June and July of 2003, she began having attendance problems.  (Id. at 40.)  After several months, on October 16, 2003, A. B. Montgomery ("Mr. Montgomery"), the terminal manager, spoke with Ms. Taylor about her absenteeism.  (Ms. Taylor Dep. at 183); (Ms. Taylor Aff. ¶ 6.)  During that meeting which occurred on a Thursday, Ms. Taylor reported for the first time that Mr. Killebrew, a manager and one of Ms. Taylor's supervisors, had been sexually harassing her since the onset of her employment with CSXT.  (Ms. Taylor Dep. at 61); (Ms. Taylor Aff. ¶¶ 1-2); (Ex. D to Doc. No. 150.)  The same day, after receiving information from Mr.

Montgomery about the harassment (Ex. D at 14 (Doc. No. 150)), Linda Hill ("Ms. Hill"), a human resource official in CSXT's headquarters in Jacksonville, Florida, called Ms. Taylor and interviewed her over the telephone.  (Ms. Taylor Dep. at 61-63); (Ms. Taylor Aff. ¶ 6); (Ex. D at 14 (Doc. No. 150).)  Ms. Taylor described the acts of harassment and explained to Ms. Hill that "a lot of [her] absenteeism issues were related to the fact that [she] didn't want to come to work . . . [and] deal with the harassment."  (Ms. Taylor Dep. at 62-65); (Ms. Taylor Aff. ¶ 6); (Ex. D at 14 (Doc. No. 150).)  Ms. Taylor relayed, among other incidents, that Mr. Killebrew told her that he wanted to watch her "lick" an ice cream cone, that he pointed out an isolated work site and described sexual relations he had had with other employees there, and that he suggested that he would "go easy on her or help her out on the job" in return for sexual favors.  (Ex. D at 14 (Doc. No. 155)); (see also Ms. Taylor Dep. at 65-66, 102-16.)

On Monday, October 20, 2003, Kathy Arthur ("Ms. Arthur"), whose job title was "manager EEO and affirmative action," traveled to Montgomery, Alabama, to conduct interviews in relation to Ms. Taylor's complaint against Mr. Killebrew.[3]  (Ms. Taylor Dep. at 181); (Ex. 2 to Doc. No. 155.)  She interviewed 16 individuals, including Mr. Killebrew and a female contract employee who conveyed for the first time that Mr. Killebrew had made an inappropriate sexual comment to her.  (Ex. 2 to Doc. No. 155.)  Ms. Arthur also reviewed time sheets which confirmed an overlap between Ms. Taylor's and Mr. Killebrew's schedules on the night shift.  (Id.)  After completing her

---

[3] Ms. Arthur worked in CSXT's headquarters office in Jacksonville, Florida.

5

investigation, Ms. Arthur determined that the harassment had taken place, as alleged by Ms. Taylor.  (Ex. 2 to Doc. No. 155); (Ms. Taylor Aff. ¶ 9.)

As a consequence of CSXT's investigative findings, Mr. Killebrew was demoted from the position of trainmaster to that of assistant trainmaster, a non-managerial position, but with no reduction in salary.  (Ex. 2 to Doc. No. 155.)  Concomitantly, Mr. Killebrew was stripped of all supervisory authority over Ms. Taylor.  (Id.)  Additionally, management prohibited Mr. Killebrew from being alone with Ms. Taylor and directed him not to ask Ms. Taylor to drive him anywhere.  (Id.)  Mr. Killebrew also was forbidden from using the unisex restroom when Ms. Taylor was on duty and was told to remove a sexually-suggestive screensaver from his work computer.  (Id.); (see also Ms. Taylor Aff. ¶ 3.)

Ms. Taylor complains that she was treated adversely after she reported the harassment to Mr. Montgomery on October 16, 2003.  She says that, "[w]ithin 11 days of [her] initial complaint[,] two actions were taken that prevented [her] from being able to work."  (Ms. Taylor Br. at 10 (Doc. No. 155).)  First, Ms. Taylor says that she was directed to furnish a medical form (an "MD-5" form) to excuse a recent absence, but that she had not been required to submit this form for a previous medical absence.  (Ms. Taylor Aff. ¶ 8); (see also clerk's journal book (Ex. 6 to Doc. No. 155).)

Second, Ms. Taylor says that she "was effectively taken out of service and prevented from working."  (Ms. Taylor Aff. ¶ 8.)  Angie Averitte ("Ms. Averitte"), assistant superintendent of operations of CSXT's Atlanta Division, orally directed that

Ms. Taylor not be scheduled to work on Mr. Killebrew's shift.  (Id. ¶ 10.)  A CSXT log book, which Ms. Taylor describes as the "clerk's journal book" indicates that Mr. Montgomery complied with Ms. Averitte's directive.  (Ms. Taylor Br. at 9 (Doc. No. 155).)  The clerk's journal book contains a notation on "10/27" which reads as follows: "Do not call S. L. Taylor for 1st or 2nd shifts, Monday thru Fri this wk per Mr. Montgomery."  (Ex. 7 to Doc. No. 155.)  Following this notation is an "additional note," stating, "Do not call S. L. Taylor to work when Mr. Killebrew is working per Montgomery."  (Id.)

Ms. Taylor also was not scheduled to work on the third shift with another supervisor, Doug Yow ("Mr. Yow").  Given that Mr. Yow had been the subject of a sexual harassment complaint in the past, Ms. Arthur believed that Mr. Yow may harbor an unfounded resentment against Ms. Taylor.  (Ms. Taylor Aff. ¶ 10); (Ms. Taylor Br. at 5 (citing Ex. 8 to Doc. No. 155).)  Consequently, Ms. Taylor says that she was restricted to working only on weekends.  (Ms. Taylor Aff. ¶ 10.)  While Ms. Taylor undisputedly suffered a reduction in her hours, there is evidence that "Ms. Taylor was being paid . . . when she did not work in order to keep her away from Mr. Killebrew." (Ex. D at 82 (Doc. No. 150).)  Although Ms. Taylor admits that Mr. Killebrew no longer harassed her after she reported his inappropriate conduct to Mr. Montgomery, she attributes the cessation of the harassment to her inability to work which effectively eliminated all contact with Mr. Killebrew.  (Ms. Taylor Dep. at 189.)

On November 22, 2003, in matters unrelated to her employment, Ms. Taylor was arrested on a felony charge of obstruction of justice for using a false identity when she was stopped for a seatbelt citation.  On the same date, she also was arrested on misdemeanor charges for negotiating worthless instruments (i.e., passing bad checks). (Dec. 9 Tr. (Ex. D at 65-66, Doc. No. 150).)  On November 25, 2003, a supervisory CSXT employee read a report in a Dothan, Alabama, newspaper that Ms. Taylor had been arrested.  The employee faxed a copy of the newspaper report to an individual employed in CSXT's Jacksonville, Florida, office.[4]  (Id. at 52-53. ) As a result, Ms. Taylor received a letter, dated December 1, 2003, from CSXT, directing her to attend a "formal investigation" on December 9, 2003.[5]  (Id. at 49.)  The letter was authored by C. A. Kephart ("Mr. Kephart"), CSXT's superintendent of operations, Atlanta Division.[6] (Id.)

The purpose of the formal investigation, as outlined in the letter, was "to determine [Ms. Taylor's] responsibility, if any," for the following conduct:

---

[4] Apparently, the newspaper incorrectly reported that Ms. Taylor had been arrested for possession of a controlled substance.  (Dec. 9 Tr. (Ex. D at 52, Doc. No. 150).)  The charge actually was obstruction of justice.  (Ms. Taylor Dep. at 123-25.)

[5] The proceedings from the formal investigation have been transcribed and are part of the record.  (Dec. 9 Tr. (Ex. D at 49-69, Doc. No. 150).)

[6] Although Ms. Taylor's receipt of notice of the formal investigation is not at issue in this case, the court notes that Ms. Taylor says that she did not receive the December 1 letter, but rather learned of the proceedings when she called CSXT to "mark[] up."  (Dec. 9 Tr. (Ex. D at 51, Doc. No. 150).)  Evidently, when extra-board clerks "mark[] up," they are placing themselves on call for work.

> Conduct unbecoming an employee in that you were arrested on November 22, 2003, by law enforcement authorities involving charges of obstructing justice [by] using a false identity and also charges in Houston and Pike counties for writing bad checks (negotiating with worthless instruments), and all circumstances relating thereto.

(Id.)  Ms. Taylor also was advised in the same letter that she was "being withheld from service pending the outcome of the investigation," meaning essentially that she was suspended without pay.  (Id.)

On December 2, 2003, Ms. Taylor pleaded guilty to the charges for negotiating worthless instruments, (Ms. Taylor Dep. at 168), and, on December 9, she attended CSXT's formal investigation.  During these proceedings, Ms. Taylor was represented by a union representative and testified.  (Dec. 9 Tr. (Ex. D at 50, 52, Doc. No. 150)); (Ms. Taylor Dep. at 144.)  During her testimony, Ms. Taylor confirmed that she had pleaded guilty to the charges for negotiating worthless instruments.  (Dec. 9 Tr. at 15 (Ex. D at 63, Doc. No. 150).)  There was no mention of Ms. Taylor's sexual harassment charge at the December 9 hearing.  (Id.)

By letter dated December 29, 2003, after the conclusion of the formal investigation, CSXT advised Ms. Taylor of its determination that she was "guilty of the charges" and that, consequently, she was being terminated, effective December 29, 2003.  (Ex. D at 70 (Doc. No. 150)); (Special Board of Adjustment Op (Ex. D at 75, Doc. No.

150).)  The letter was authored by Gil Kovar ("Mr. Kovar"), in his capacity as the general

manager of CSXT's Atlanta Division.[7]  (See Mr. Kovar Decl. ¶ 1.)

Mr. Kovar attests that he is the one who "made the decision to terminate" Ms.

Taylor.  (Id. ¶ 2.)  He says that he reviewed the transcript from the December 9 formal

investigation and learned from that transcript that Ms. Taylor had pleaded guilty to

misdemeanor charges of negotiating worthless instruments.  (Id. ¶¶ 2-3.)  Based on his

review of the transcript, Mr. Kovar terminated Ms. Taylor.  (Id.)

Mr. Kovar attests that he "customarily terminated employees who were found

guilty of committing crimes," (id. ¶ 3), in violation of Section 501-A of CSXT's

"operating rules" which provides that criminal conduct which may damage the company's

reputation is prohibited.  (Regulations (Ex. D at 47, Doc. No. 150).)  Furthermore, he

states, "To my knowledge, I have never failed to terminate an employee who was guilty

of negotiating a worthless instrument."  (Mr. Kovar Decl. ¶ 3.)  Mr. Kovar also denied

Ms. Taylor's appeal.  (Letter, dated April 15, 2004 (Ex. D at 71, Doc. No. 150).)

Ms. Taylor complains that she was treated differently than other CSXT employees

who had criminal charges lodged against them, but were not fired.  One employee is her

ex-husband.  She says that he was charged with domestic violence and filing a false

police report.  Ms. Taylor, however, does not "believe that anything ever happened with

---

[7] The court observes that Mr. Kovar's declaration conforms with 28 U.S.C. § 1746 which governs unsworn declarations made under penalty of perjury.  Declarations may be submitted in lieu of affidavits in federal proceedings.  See Colodny v. Iverson, Yoakum, Papiano & Hatch, 936 F. Supp. 917, 926 n.2 (M.D. Fla. 1996).

the domestic violence" charge, and she does not know the disposition of the charge against her ex-husband for filing a false report.  (Ms. Taylor Dep. at 141-43); (Ms. Taylor Aff. ¶ 15.)  The other employee identified by Ms. Taylor was charged with attempted murder and was permitted to return to work prior to being "acquitted."  (Ms. Taylor Aff. ¶ 15); (Ms. Taylor Dep. at 133-34, 137-39.)

    The union filed a grievance on behalf of Ms. Taylor and represented her before the Special Board of Adjustment ("Board").  (Ms. Taylor Aff. ¶ 12.)  The Board concluded that the charge against Ms. Taylor for "using a false identity was without merit."  (Board Op. at 3 (Ex. D at 76, Doc. No. 150).)  Moreover, although Ms. Taylor pleaded guilty to negotiating worthless instruments, the Board found forgivable Ms. Taylor's conduct which involved writing two checks, totaling $52, which were returned for insufficient funds.  (Id.)  Based on the foregoing findings, the Board ordered Ms. Taylor's employment to be reinstated.  (Id.)  On the issue of backpay, the Board observed that "[t]here is no doubt that [Ms. Taylor's] arrest was of her own doing, even though the charges were not as severe as they originally appeared."  (Id.)  It, thus, concluded that Ms. Taylor "must . . . share some of the responsibility for what occurred."  (Id. at 3-4.)  As a consequence, instead of awarding a full year's backpay, the Board ordered Ms. Taylor "restored to service with seniority and all other rights intact, with six months' backpay, less outside earning."  (Id. at 77); (see also CSXT Reply at 7-8 (Doc. No. 156).)

    CSXT has offered evidence to demonstrate that, at all relevant times to this lawsuit, it had in place an anti-harassment policy with procedures for reporting sexual

harassment.  CSXT's policy describes CSXT's "zero tolerance" for sexual harassment and its commitment to "provid[ing] all employees with a working environment, which is free of harassment by supervisors, other employees, customers, vendors, agents and other third parties."  (Policy (Ex. 5 to Doc. No. 155).)  The policy defines and gives examples of sexual harassment, provides several alternative means for reporting harassment, including a toll-free hotline, and permits employees to bypass a harassing supervisor in making a sexual harassment complaint.  (Id.)  The policy also expressly prohibits "[d]iscrimination or retaliation against an individual who brings a complaint of sexual harassment[,] and ensures that "[c]omplaints and investigations will remain confidential to the greatest extent possible within the investigative framework."  (Id.)  CSXT also has presented evidence that the policy was posted through several means, accessible to Ms. Taylor, when Ms. Taylor commenced work with CSXT in April 2003.  (See id. (April 1, 2002 effective date)); (Angie Averitte Decl. ¶ 2); (Ms. Taylor Dep. at 80-81, 86-88.)  Ms. Taylor does not dispute that CSXT "had a mechanism in place in the form of a published policy to address harassment."  (Ms. Taylor Br. at 19 (Doc. No. 155).)

On or about October 16, 2003, more than six months after Mr. Killebrew began harassing Ms. Taylor, Ms. Taylor followed the policy's complaint procedures by reporting Mr. Killebrew's harassment to Mr. Montgomery, the next level of management over Mr. Killebrew.  (See id.); (see Ms. Taylor Br. at 3 (Doc. No. 155).)  Ms. Taylor says that, although Mr. Killebrew started harassing her at the inception of her employment in April 2003 (EEOC Charge (Ex. D at 42, Doc. No. 150)), she delayed reporting the

12

harassment because she was fearful.  She was "afraid" because she was a new employee.

(Ms. Taylor Aff. ¶ 4.)  She also was afraid because, as a child, she had been the victim of

abuse and suffered negative consequence when she reported that abuse.  (Id.)

Seeking redress for discrimination and retaliation, on January 14, 2004, Ms.

Taylor filed a charge with the Equal Employment Opportunity Commission ("EEOC").

(See EEOC Charge (Ex. D at 42, Doc. No. 150).)  In her EEOC charge, she alleged that

her "immediate supervisor" began sexually harassing her on or about April 8, 2003.  (Id.)

Ms. Taylor stated that, four days after she reported the harassment in October 2003, she

suffered retaliation in the form of unfounded charges against her by CSXT.  (Id.)

Furthermore, therein, Ms. Taylor provided that she had been suspended without pay

pending the outcome of her termination hearing and had been without pay since

November 25, 2003.  (Id.)

After receiving a right-to-sue letter from the EEOC, Ms. Taylor timely filed this

lawsuit on October 8, 2004.[8]  (See Compl. ¶ 2 (Doc. No. 1).)  Ms. Taylor's Complaint

contains four counts.  Counts I and II allege "hostile working environment" and "*quid pro

quo*" sexual harassment, in violation of Title VII "or" § 1981.  (Id. ¶¶ 2, 8-15.)  Count III

---

[8] CSXT has not challenged Ms. Taylor's allegations in the Complaint that she fulfilled
the jurisdictional requirements for filing a Title VII lawsuit.  See Forehand v. Florida
State Hosp. at Chattahoochee, 89 F.3d 1562, 1567 (11th Cir. 1996) ("Before instituting a
Title VII action in federal district court, a private plaintiff must file an EEOC complaint
against the discriminating party and receive statutory notice from the EEOC of his or her
right to sue the respondent named in the charge.").  The court, therefore, finds that, for
purposes of ruling on the instant summary judgment motion, these Title VII prerequisites
have been satisfied.

is a Title VII/§ 1981 retaliation claim.  (Id. ¶¶ 2, 16-17.)  Count IV asserts a state law

claim for intentional infliction of emotional distress.  (Id. ¶¶ 18-20.)  Ms. Taylor seeks

declaratory and injunctive relief, compensatory and punitive damages, back pay and front

pay, costs, attorneys' fees and "other further and different relief as the Court deems

necessary and proper."  (Id. at 1, 3-4.)  CSXT moves for summary judgment on all claims

in the Complaint.


## V.  DISCUSSION

### A.  Title VII

#### 1. *Sexual Harrassment* (Counts I and II)

Sexual harassment violates Title VII "[w]hen the workplace is permeated with

'discriminatory intimidation, ridicule, and insult,' that it is 'sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive

working environment.'"  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting

Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)).  In order to establish

that she was sexually harassed, Ms. Taylor must prove:

> (1) that . . . she belongs to a protected group;
> (2) that [she] has been subject to unwelcome sexual harassment, such as sexual
> advances, requests for sexual favors, and other conduct of a sexual nature;
> (3) that the harassment [was] based on [her] sex . . .;
> (4) that the harassment was sufficiently severe or pervasive to alter the terms and
> conditions of employment and create a discriminatorily abusive working
> environment; and
> (5) a basis for holding the employer liable.

14

Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

As to the fifth Mendoza element, the test for employer liability differs depending upon whether the harasser is a co-employee or a supervisor.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) ("Ellerth"); Faragher v. City of Boca Raton, 524 U.S. 775 (1998) ("Faragher").  Here, it is not disputed that, as a trainmaster, Mr. Killebrew exercised "immediate (or successively higher) authority" over Ms. Taylor so as to accord him Title VII supervisory status.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1278 (11th Cir. 2002); see also Dinkins v. Charoen Pokphand USA, Inc., 133 F. Supp.2d 1254, 1266-67 (M.D. Ala. 2001) (defining the Title VII supervisor).

In Ellerth and Faragher, the Supreme Court has distinguished between sexual harassment cases in which the supervisor takes a tangible employment action against the subordinate and those in which the supervisor does not.  Ellerth, 524 U.S. at 760-65; Faragher, 524 U.S. at 807.  An employer will be held "strictly liable" for unlawful sexual harassment "if the supervisor takes tangible employment action against the victim."  Miller, 277 F.3d at 1278 (quoting Faragher, 524 U.S. at 807).  In the absence of a tangible employment action, the employer will be vicariously liable to the employee for actionable sexual harassment by a supervisor, unless the employer can prove by a

preponderance of the evidence a two-part affirmative defense, discussed below.[9]  Ellerth,

524 U.S. at 765; Faragher, 524 U.S. at 807-08.

Ms. Taylor asserts that the harassment she endured from Mr. Killebrew was

sufficiently severe or pervasive so as to alter her workplace conditions and create an

abusive environment and that CSXT is strictly liable because she suffered a tangible

employment action.  (Ms. Taylor Br. at 13-18 (Doc. No. 155).)  Alternatively, even

_____

[9] In her Complaint, Ms. Taylor divides her sexual harassment claim into two counts,
labeling Count I as "hostile work environment" and Count II as "*quid pro quo*."  As to
Ms. Taylor's categorization, two points are worth noting.  First, the Supreme Court's
decisions in Ellerth and Faragher largely have abandoned the "labels '*quid pro quo*' and
'hostile environment' to analyze whether an employer should be held liable on an
employee's Title VII claim concerning a supervisor's sex-based harassment."  Frederick
v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1311 (11th Cir. 2001).  "Instead, when
analyzing whether an employer should be held liable for a supervisor's harassment,
courts should separate these cases into two groups: (1) harassment which culminates in a
'tangible employment action' . . ., and (2) harassment in which no adverse 'tangible
employment action' is taken but which is sufficient to constructively alter an employee's
working conditions."  Id.; see also Johnson v. Booker T. Washington Broad. Serv., Inc.,
234 F.3d 501, 508 (11th Cir. 2000) ("Generally, sexual harassment comes in two forms:
harassment that does not result in a tangible employment action (traditionally referred to
as 'hostile work environment' harassment), and harassment that does result in a tangible
employment action (traditionally referred to as '*quid pro quo*' harassment.") (citing
Ellerth, 524 U.S. at 760-63).

Second, while Ms. Taylor depicts her sexual harassment allegations as comprising
two claims, legally there is only one sexual harassment claim.  "Hostile work
environment" and "*quid pro quo*," now distinguished on the ground of whether or not the
employee was subjected to a tangible employment action, are two alternative *theories* by
which a plaintiff may prove her sexual harassment *claim*.  Hulsey v. Pride Rest., LLC,
367 F.3d 1238, 1246 (11th Cir. 2004).  Herein, the court refers to Ms. Taylor's "*quid pro
quo* claim" as a "tangible employment action" theory and her "hostile work environment
claim" as the theory of liability by which she alleges that the sexual harassment did not
culminate in a "tangible employment action," but was sufficiently severe or pervasive to
alter the terms and conditions of her employment.

absent proof of a tangible employment action, Ms. Taylor contends that CSXT nonetheless is liable because it has failed to demonstrate its entitlement to the Ellerth/Faragher affirmative defense.  (Id. at 18-23.)  For purposes of summary judgment, CSXT has not challenged Ms. Taylor's assertion that Mr. Killebrew's conduct constitutes unlawful sexual harassment.  CSXT, however, contends that Ms. Taylor did not suffer a tangible employment action causally related to the sexual harassment and that, therefore, it may rely on the Ellerth/Faragher affirmative defense which CSXT says absolves it from liability. (CSXT Br. at 3-6 (Doc. No. 151)): (CSXT Reply at 3-4 (Doc. No. 156).)  The court assumes for present purposes, as CSXT does, that Mr. Killebrew sexually harassed Ms. Taylor, in violation of Title VII, and focuses on whether, under the fifth Mendoza element, there is a basis for holding CSXT liable for that harassment.

(a) Tangible Employment Action Theory

"An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because she refused to give in to his sexual overtures.  That liability exists regardless of whether the employee took advantage of any employer-provided system for reporting harassment."  Hulsey, 367 F.3d at 1245.  In other words, CSXT is strictly liable for Killbrew's harassment if Ms. Taylor demonstrates that "a tangible employment action resulted from a refusal to submit to [Mr. Killebrew's] sexual demands[.]" Ellerth, 524 U.S. at 753; Hulsey, 367 F.3d

17

at 1245 (tangible employment action sexual harassment occurs "if the employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action").

An employer may defeat an employee's tangible employment action theory in one of two ways.  See Smith v. Cashland, Inc., 193 F.3d 1158, 1159 (10th Cir. 1999).  First, the employer may submit proof that the employment decision does not rise to the level of a "tangible employment action."  See id.; Ellerth, 524 U.S. at 753.  "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[10]  Ellerth, 524 U.S. at 761.  A "significant change in benefits," within the meaning of Ellerth, also occurs when a "reduction in an employee's hours" results in a reduction of "the employee's take-home pay."  Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006).

Second, the employer may argue that there is no "causal connection" or "causal link" between the tangible employment action and the sexual harassment.  Id. at 1232

---

[10] The Eleventh Circuit has observed that, although courts use different terminology in requiring that an employee in a discrimination case demonstrate an adverse employment action, the various standards "are essentially interchangeable."  Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001); see also Savino v. C.P. Hall Co., 199 F.3d 925, 932 n.8 (7th Cir. 1999) ("[A] tangible employment action is akin to an adverse employment action, as courts have used the term.").  The court, thus, finds that decisions involving determinations of what constitutes an adverse employment action in discrimination contexts other than sexual harassment are relevant in analyzing whether Ms. Taylor has established a tangible employment action in this case.

(The plaintiff "had to prove more than the mere reduction of her hours; [she] had to prove that the reduction was causally related to the incident of harassment."); <u>Arnold v. Tuskegee Univ.</u>, Civ. A. No. 3:03cv515-F, 2006 WL 47507, *9 (M.D. Ala. 2006) (Fuller, Chief J.) ("While some actions taken against [plaintiff] may qualify as tangible employment actions, [plaintiff] has failed to demonstrate that many of these actions were taken against her because of her gender.").  The court reads <u>Cotton</u> as establishing that, at least when the harassing supervisor is not involved in the challenged employment decision, the employer may prevail by presenting evidence that it imposed the tangible employment action for legitimate reasons and not because the employee refused to accede to the sexual advances of her supervisor.[11]  <u>Cotton</u>, 434 F.3d at 1232; <u>see also</u> <u>Smith</u>, 193 F.3d at 1160 (same); <u>Spivey v. Akstein</u>, No. 104cv1003WSDCCH, 2005 WL 3592065, *15 (N.D. Ga. Dec. 30, 2005) (observing that "causal connection" requirement in a sexual harassment case simply may be another way of stating that an employer is not liable if the tangible employment action "was unrelated to [the employee's] sex and was based on a legitimate, non-discriminatory reason") (order adopting and attaching recommendation of magistrate judge).

_____

[11]  The court notes that "any time the harasser makes a tangible employment decision that adversely affects the plaintiff, an inference arises that there is a causal link between the harasser's discriminatory animus and the employment decision." <u>Llampallas v. MiniCircuits, Lab, Inc.</u>, 163 F.3d 1236, 1247 (11th Cir. 1998).  "A Title VII plaintiff, therefore, may establish her entire case simply by showing that she was sexually harassed by a fellow employee, and that the harasser took a tangible employment action against her." <u>Id.</u>

In Cotton, *supra*, the plaintiff complained that her part-time hours were reduced because she refused to succumb to her supervisor's alleged harassment.  See 434 F.3d at 1232.  The Eleventh Circuit disagreed, holding that the plaintiff "failed to establish a causal connection between the reduction in her hours and the incident of harassment."  Id. It was undisputed that the harassing supervisor did not prepare the employees' work schedules, see id., and the record evidenced that reasons unrelated to the sexual harassment underpinned the challenged employment decision.  Namely, at the time of her hiring, the plaintiff was informed that, after the Christmas holidays, the number of hours she worked would decrease.  Not only was the "the timing of the reduction . . . in line with her expectation," but other part-time employees also received similar reductions in their hours.  Id.  The Eleventh Circuit also concluded that the plaintiff partially was to blame for the decrease in her hours because she took vacation time and sick leave after the holidays.  See Id.

Relying on a retaliation case for its discussion of temporal proximity, id. (citing Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999)), the Eleventh Circuit observed:  "Although temporal proximity between the harassment and a tangible employment action can give rise to a genuine issue of fact as to causation, this conclusion is not warranted in [the plaintiff's] case."  Id.  The Eleventh Circuit concluded that, "[h]ere, unlike in Farley, an inference of causation is negated by [the plaintiff's] own testimony of her expected reduced in working hours, even though the reduction in hours was temporally proximate."  Id.

20

Similarly, in Walton v. Johnson & Johnson, where the plaintiff argued that her termination was the culmination of her supervisor's sexual harassment, the Eleventh circuit concluded that there was no evidence that the harassing supervisor "played a role in the decision to terminate her." 347 F.3d 1272, 1282 n.7 (11th Cir. 2003). The Eleventh Circuit held that the plaintiff could not establish the tangible employment action requirement because there was "absolutely no evidence in the record that she was discharged (as opposed to being harassed) *because of her sex*." Id. at 1281 (emphasis in original). The undisputed evidence revealed that the plaintiff's termination resulted from her voluntary election to receive long-term disability benefits; there was no evidence that the plaintiff's sex was a consideration when the employer terminated her. See id. at 1281-82. The Eleventh Circuit concluded that the plaintiff "was unable to establish a genuine issue of material fact as to the reason for [her] termination." Id. at 1282.

Turning to the arguments of the parties, Ms. Taylor advances what she contends are two tangible employment actions. First, Ms. Taylor complains that the work restrictions placed upon her (due to the requirements that she submit an MD-5 medical form and avoid working shifts with Mr. Killebrew and Mr. Yow), following her complaint of harassment on October 16, 2003, effectively "cut off" her ability to work and to earn income. (Ms. Taylor Br. at 14-17 (Doc. No. 155).) The alleged loss of pay is the negative consequence of which she complains. Second, Ms. Taylor appears to

contend that her termination was a tangible employment action for purposes of her sexual harassment claim.[12]  (Id. at 15.)

In response to Ms. Taylor's position, CSXT does not dispute that a loss of pay and termination are tangible employment actions.  It, however, disagrees that Ms. Taylor, in fact, suffered any diminution in pay between October 16, 2003, when she reported the harassment, and November 25, 2003, when her arrest appeared in a Dothan newspaper. CSXT contends that, although Ms. Taylor worked fewer hours during this approximate six-week period, there is no evidence that she was not paid full wages for the hours CSXT was unable to schedule her for work.  It contends, therefore, that Ms. Taylor cannot complain that she suffered a tangible employment action as a result of her reduced hours.  To a limited extent, thus, CSXT challenges the absence of proof of a tangible

_____

[12] Two other employment decisions have been cited by the parties, but have not been relied upon Ms. Taylor as bases for her sexual harassment claim.  They, however, are worth mentioning.  First, CSXT's brief includes extended discussion pertaining to the fact that Ms. Taylor requested but, ultimately, was a denied a transfer to CSXT's Dothan office.  (CSXT Br. at 3, 5-6 (Doc. No. 151)); (CSXT Reply at 2-3 (Doc. No. 156).)  Ms. Taylor, however, has not mentioned the denied transfer in her opposing brief or otherwise contended that she suffered a "tangible employment action" by CSXT's refusal to award her the transfer, and, therefore, the court has not considered whether or not the denial of the transfer was related to Ms. Taylor's refusal to give in to Mr. Killebrew's sexual demands.

Second, after Ms. Taylor complained of Mr. Killebrew's harassment, she also received notice of the initiation of a "formal investigation" against her relating to her absence from work on October 17, 2003.  That charge, however, was "eventually dropped," apparently because her absence on the day in question was attributed to the fact that Mr. Killebrew was scheduled to work on her shift.  (Ms. Taylor Aff. ¶ 10.) Because this charge did not result in any negative employment consequence to her, Ms. Taylor appropriately has not cited this instance as rising to the level of a tangible employment action.

employment action.  The focal point of CSXT's argument, however, is that the evidence is devoid of any causal connection between the sexual harassment and the employment decisions of which Ms. Taylor complains.

For the reasons to follow, the court agrees with CSXT that Ms. Taylor's tangible employment action theory fails because of a complete lack of proof of a causal link.  The court, however, pauses briefly to address CSXT's other argument.

It is undisputed that CSXT stopped paying Ms. Taylor on November 25, 2003, when its employee read about her arrest in a local newspaper and that, at that time, CSXT essentially placed Ms. Taylor on leave without pay pending investigation.  It also is undisputed that Ms. Taylor was terminated on December 29, 2003.  The loss of pay Ms. Taylor suffered after November 25 and her resulting termination on December 29 clearly constitute "significant change[s] in employment status."  Ellerth, 524 U.S. at 761.  No argument to the contrary has been advanced.

The evidence, however, does not give rise to a reasonable inference that the reduction in Ms. Taylor's work hours between October 16, 2003, when Ms. Taylor reported the harassment, and November 25, 2003, resulted in any diminution of pay.[13]

---

[13] Ms. Taylor's assertion in brief that, "as a result of not being able to work with the harasser[,] . . . she suffered in her salary" (Ms. Taylor Br. at 14 (Doc. No. 155)) is not evidence.  See Rich v. Dollar, 841 F.2d 1558, 1565 n.5 (11th Cir. 1988) (noting that district court appeared to "have relied on assertions in the memorandum prepared by [plaintiff's] counsel rather than upon the factual showing submitted under oath by [plaintiff]"); Franz v. Raymond Eisenhardt & Sons, Inc., 732 F. Supp. 521, 528 (D.N.J. 1990) (counsel's arguments in summary judgment briefs are not evidence which the court may consider in determining whether a genuine issue for trial exists).

See Southway Theatres, Inc. v. Georgia Theatre Co., 672 F.2d 485, 493 (5th Cir. Unit B

1982) ("The party opposing a motion for summary judgment is entitled to the benefit only

of reasonable inferences that may be drawn in its favor.").[14]  In her EEOC statement, Ms.

Taylor "declare[d] under penalty of perjury" only that she had "been without pay since

November 25, 2003."  (See EEOC Charge (Ex. D at 42, Doc. No. 150).)  Ms. Taylor did

not refute that date during her deposition, (see, e.g., Ms. Taylor Dep. at 205), and her

affidavit is not contradicting.  Notably absent from Ms. Taylor's affidavit is any

attestation that she actually lost income during this six-week period; rather, she merely

states that she was "prevented from working."  (Ms. Taylor Aff. ¶ 8.)  Moreover, in Ms.

Averitte's notes of investigation pertaining to Ms. Taylor's sexual harassment complaint,

Ms. Averitte indicated that "Ms. Taylor was being paid . . . when she did not work in

order to keep her away from Mr. Killebrew."[15]  (Ex. D at 82 (Doc. No. 150).)

The only evidence in the record indicates that Ms. Taylor was compensated for the

hours CSXT did not schedule her to work due to conflicts with Mr. Killebrew's schedule

and that she did not suffer any income loss until November 25, 2003.  Ms. Taylor has not

argued or presented evidence of any other jeopardized employment benefit she suffered

_____

[14] In the Eleventh Circuit, decisions of Unit B of the former Fifth Circuit are binding
precedent.  Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982).

[15] The court observes that neither party has argued that Ms. Arthur's notes taken during
her investigation of Ms. Taylor's sexual harassment complaint are not trustworthy so as
to preclude the admissibility of the notes pursuant to the business records exception to the
hearsay rule.  See Fed. R. Evid. 803(6); La Day v. Catalyst Tech., Inc., 302 F.3d 474, 484
n.7 (5th Cir. 2002).

as a result of her reduced hours.  For example, the record is devoid of facts that her

prospects for a promotional or permanent position were thwarted or that she was deprived

of any economic or other job benefit.  The court, therefore, is not convinced that the

change in her work schedule between October 16, 2003, the date she reported the

harassment, and November 25, 2003, rises to the level of a tangible employment action.

See Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004) (holding that

temporary reduction in hours without reduction in pay did not constitute adverse

employment action); Moore v. Miami-Dade County, No. 02-33421, 2005 WL 3273722,

*11 (S.D. Fla. 2005); contrast Cotton, 434 F.3d at 1231 ("A reduction in an employee's

hours, which reduces the employee's take-home pay, qualifies as a tangible employment

action."); Strother v. S. Cal. Permanente Med. Group, 79 F.3d 859, 869 (9th Cir. 1996)

(Removal from a position that may lead to pay increases can constitute an adverse

employment action).  Even assuming, though, that the reduction in her work hours is a

tangible employment action, Ms. Taylor has not demonstrated a causal link between the

reduced hours and the sexual harassment.

As stated, the essence of "*quid pro quo*" sexual harassment, now described as the

tangible employment action theory of sexual harassment, is that the tangible employment

action was taken against the employee because she failed to yield to the sexual advances

of the harassing supervisor.  See Ellerth, 524 U.S. at 753; Hulsey, 367 F.3d at 1245.  On

this record, for the reasons to follow, the court finds that there is a complete absence of

any evidence that the challenged tangible employment actions were the result of Ms.

25

Taylor's failure "to perform sexual acts for her supervisor."  (Ms. Taylor Compl. ¶ 15.)

As in Cotton, *supra*, and Walton, *supra*, it is evidence of a causal link between the

tangible employment actions and Mr. Killebrew's sexual harassment which is lacking.

Initially, the court emphasizes that there is no evidence indicating that Mr.

Killebrew was involved in any of the decisions regarding Ms. Taylor's work schedule,

pay or continued employment after Ms. Taylor complained on October 16, 2003.  To the

contrary, once Ms. Taylor lodged her sexual harassment complaint against Mr. Killebrew,

Mr. Killebrew was stripped of all supervisory authority over Ms. Taylor.  (Ex. 2 to Doc.

No. 155.)  Rather, the record establishes that Ms. Averitte initially made the decision that

Ms. Taylor's schedule should not overlap with the schedules of Mr. Killebrew's and Mr.

Yow's, the decision which Ms. Taylor says resulted in the loss of her ability to work a

full schedule, and that Mr. Montgomery enforced Ms. Averitte's directive.  (Ms. Taylor

Aff. ¶ 10); (Ex. 7 to Doc. No. 155.)  There also is no evidence that Mr. Killebrew was

involved in or had any influence over CSXT's decision to suspend Ms. Taylor's pay on

November 25, 2003, pending her formal investigation.  That decision was announced by

Mr. Kephart, who worked in CSXT's Atlanta office.  (See Dec. 9 Tr. (Ex. D at 49, Doc.

No. 150).)

Likewise, it is undeniable that the decision to terminate Ms. Taylor on December

29, 2003, was not made by Mr. Killebrew, but was made by Mr. Kovar, who also worked

in the Atlanta office, based upon his review of the transcript from Ms. Taylor's formal

investigation.  (Mr. Kovar Decl. ¶ 1.)  Because there is no evidence that Mr. Killebrew

26

made or influenced any of the employment decisions at issue, the automatic inference of causal connection which arises when the harasser is involved in the decisionmaking does not come into play.  See Llampallas, 163 F.3d at 1247.

The court, thus, must discern whether there exists a genuine issue of material fact that a causal link existed between the tangible employment actions and the sexual harassment.  For purposes of analyzing the legitimacy of CSXT's asserted reasons for its employment decisions which CSXT contends negates the causal link, the court categorizes the challenged employment decisions as three separate actions:  (1) the reduction in Ms. Taylor's hours (which did not result in any diminution in pay) between October 16, 2003, when Ms. Taylor reported the harassment, and November 25, 2003, when a CSXT employee read about her arrest in a newspaper; (2) the time period between November 25, 2003, and December 29, 2003, when Ms. Taylor was "withheld from service" without pay pending the outcome of CSXT's investigation of the criminal charges (Ex. D at 49 (Doc. No. 150)); and (3) her termination.

First, the evidence establishes that between October 16, 2003, and November 25, 2003, not only was Ms. Taylor paid for the missed work hours, but also that CSXT's decision to prohibit Ms. Taylor from working on the same shift with either Mr. Killebrew or Mr. Yow was a direct response to its investigation of Ms. Taylor's sexual harassment complaint which concluded favorably to Ms. Taylor.  The only evidence demonstrates that CSXT's decision was implemented to attempt to end, not further, the sexual harassment to which Ms. Taylor had voiced opposition.  Although Ms. Taylor was

27

dissatisfied with CSXT's "remedy" of prohibiting her from working any schedule which overlapped with Mr. Killebrew's or Mr. Yow's, Ms. Taylor has not submitted any evidence suggesting that Ms. Averitte, Mr. Montgomery or any other employee acting on behalf of CSXT took into account Ms. Taylor's sex or otherwise restricted Ms. Taylor's working hours because she refused Mr. Killebrew's advances.[16]  The causal link simply is missing.

Second, there is no evidence that CSXT, or the employees acting on its behalf, gave any consideration to Ms. Taylor's sex when she was suspended without pay as of November 25, 2003, such that the court can infer a causal link.  Rather, the evidence establishes that CSXT's decision to initiate a formal investigation and to "withh[o]ld" Ms. Taylor "from service" pending investigation were made because CSXT became aware that Ms. Taylor had been arrested.  (Dec. 9 Tr. at 1 (Ex. D at 49, Doc. No. 150).) The court finds that Ms. Taylor's arrest constitutes an intervening event which breaks any causal connection between her complaint of sexual harassment and CSXT's decision not

---

[16] To the extent that Ms. Taylor contends that the "remedy" was imposed as punishment because she complained about Mr. Killebrew's sexual harassment, that argument sounds not in sexual harassment, but in retaliation.  Indeed, the reverberating theme throughout Ms. Taylor's pleadings is that her work hours were reduced and she was terminated in retaliation for having lodged an internal complaint against Mr. Killebrew about the harassment.  Ms. Taylor appears to be attempting to recast her allegations of retaliatory conduct in a sexual harassment, tangible employment action format; at the very least, she appears to be confused as to the distinction between her retaliation and sexual harassment claims.  Notably, in her brief, Ms. Taylor continuously intertwines averments of retaliation in her discussion of her tangible employment action theory.  (See, e.g., Ms. Taylor Br. at 17 (Doc. No. 155).)

28

to pay Ms. Taylor pending the outcome of the formal investigation.  Cf. Gubitosi v. Kapica, 154 F.3d 30, 33 (2d Cir. 1998) (evidence of intervening events undermines any inference of retaliatory motive and weakens the causal link); Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1147 (7th Cir. 1997) (holding that termination only a few weeks after employee complained insufficient to establish a causal link where discharge closely followed a "significant and costly error"); Wu v. Southeast-Atlantic Beverage Corp., 321 F. Supp.2d 1317, 1337 (N.D. Ga. 2004) ("any inference of retaliatory intent otherwise created by a short lapse of time can be dispelled when intervening factors are established") (collecting cases).

Moreover, the court finds that the fact that the newspaper initially misreported the alleged crime for which Ms. Taylor was arrested does not alter the fact that the arrest, not the sexual harassment, was the impetus behind CSXT's decision to initiate a formal investigation as to the validity of the charges against Ms. Taylor.  See Chapman v. AI Transport, 229 F.3d 1012, 1030-31 (11th Cir. 2000) (holding employer may terminate an employee for good or bad reason without violating federal law); Nix v. WLCY Radio/Rahall Commc'ns., 738 F.2d 1181, 1187 (11th Cir. 1984) (holding employee may be fired "for good reason, bad reason, *reason based on erroneous facts*, or no reason at all, so long as its action is not for a discriminatory reason") (emphasis added).

Third, the undisputed evidence establishes that Mr. Kovar based his decision to terminate Ms. Taylor solely on the fact that she had pleaded guilty to writing bad checks/ negotiating worthless instruments, a conviction which he opined tarnished the reputation

of CSXT.  Additionally, there is no evidence in the record, direct or circumstantial,

indicating that Mr. Kovar knew that Ms. Taylor had been the victim of sexual harassment

at the hands of a CSXT supervisor.  Ms. Taylor's sexual harassment complaint was not at

issue during the formal investigation and was never referenced or mentioned during that

proceeding.  The court finds that, as in retaliation cases, to establish a causal link, at the

very least, Ms. Taylor must establish that Mr. Kovar "was actually aware" that she had

been sexually harassed by Mr. Killebrew.  Raney v. Vinson Guard Serv., Inc., 120 F.3d

1192, 1198 (11th Cir. 1997) (citing Goldsmith v. City of Atmore, 996 F.2d 1155, 1163

(11th Cir. 1993)); see also Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1183 (11th Cir. 2005)

(rejecting constructive knowledge theory); Brungart v. BellSouth Telecomm., Inc., 231

F.3d 791, 800 (11th Cir. 2000) (holding that individual who imposed adverse employment

action on behalf of employer "did not know of the protected conduct" and "could not

have taken that action on the corporation's behalf because of the protected conduct";

plaintiff has "burden of showing a causal connection between the protected conduct and

the decision to take the adverse employment action").[17]  Stated differently, the court finds

---

[17] See also Hayes v. Potter, 310 F.3d 979, 982 (7th Cir. 2002) ("In a retaliation case, it is not enough that the decision maker should have known about a discrimination complaint; the decision maker must have had actual knowledge of the complaint for her decision to be retaliatory."); Alexander v. Wisc. Dept. of Health and Family Servs., 263 F.3d 673, 688 (7th Cir. 2001) ("Although the timing of an adverse employment action can be evidence of an act of retaliation, [plaintiff's] inability to provide 'evidence that any of the actors involved in his suspension [ ] had any knowledge of his complaint before his suspension,' prevents any such inference to be drawn from the timing of his suspension and eventual termination.").

that there is no evidence from which the court can infer that Mr. Kovar's reason actually was different than the one he [Mr. Kovar] articulated.

Although the Special Board of Adjustment ultimately disagreed with Mr. Kovar and reinstated Ms. Taylor, as pointed out by Ms. Taylor, the court's judgment as to the wisdom of Mr. Kovar's decision is irrelevant, as Title VII is not designed to make federal courts "sit as a super-personnel department that reexamines an entity's business decisions." Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991); see also Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997) (holding that "federal courts do not sit to second-guess the business judgment of employers"). Instead, the issue with which the court must concern itself is whether CSXT "took [Ms. Taylor's] gender into account." Walton, 347 F.3d at 1281. Here, the court has been presented with a legitimate reason for termination, one which is wholly independent of Ms. Taylor's sex.

Ms. Taylor argues, though, that Mr. Kovar's proffered reason for her termination is subject to disbelief because CSXT did not terminate similarly-situated employees who had been accused of crimes which were much more serious than the misdemeanors to which she pleaded guilty. (Taylor Br. at 11, (Doc. No. 155).) She identifies two employees by name; however, the court finds that neither is similarly situated to her because the evidence does not show that they were *convicted* of the crimes with which they were charged. (Ms. Taylor Aff. ¶ 15); (Ms. Taylor Dep. at 133-34, 137-39, 141-43); see Silvera v. Orange County School Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) (discussing requirements for proper comparator for purpose of raising inference of illegal

31

discrimination); see also Abel v. Dubberly, 210 F.3d 1334, 1338-89 (11th Cir. 2000) (plaintiff, who admitted taking $10 from cash register and replacing it the next day, was not similarly situated to co-worker who was accused of, but denied, stealing money from cash register).  Ms. Taylor has not pointed to any evidence in the record, and the court is aware of none, casting doubt on Mr. Kovar's reason or suggesting that Mr. Kovar's articulated reason was motivated by her gender.

In sum, the court has scoured the record, but has found no evidence from which it can infer that the tangible employment actions of which Ms. Taylor complains were somehow the result of Ms. Taylor's refusal to submit to Mr. Killebrew's advances or otherwise were based upon her sex.  Therefore, although Ms. Taylor claims that her hours were reduced, beginning on October 16, 2003, that six weeks later she was suspended without pay, and that ultimately she was fired on December 29, 2003, she has not presented any evidence that these actions resulted because of her sex or her failure "to perform sexual acts for her supervisor."  (Ms. Taylor Compl. ¶ 15.)  The court finds that Ms. Taylor has failed to establish causation.  The court, thus, finds that CSXT is not strictly liable for Mr. Killebrew's harassment because Ms. Taylor has failed to demonstrate that any tangible adverse employment action was taken against her because of her sex.

(b) No Tangible Employment Action Theory

Given the lack of evidence of a tangible employment action causally related to the sexual harassment, CSXT may avoid liability on Ms. Taylor's sexual harassment claim by demonstrating the absence of a genuine issue of material fact as to the elements of Ellerth/Faragher defense. Where no tangible employment action has occurred, in cases of workplace harassment by supervisors, the employer may raise a two-pronged affirmative defense to employer liability. This defense requires proof "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807. For an employer to prevail on this defense, "'[b]oth elements must be satisfied," and "'the defendant bears the burden of proof on both elements.'" Bryant v. School Bd. of Miami Dade County, 142 Fed. Appx. 382, 2005 WL 1669596 (11th Cir. 2005) (unpublished) (quoting Frederick, 246 F.3d at 1313).

The first element of the affirmative defense comprises two parts – "reasonable care to prevent sexual harassment" and "reasonable care to correct sexual harassment." Bryant, 2005 WL1669596, *2. To be deemed sufficiently preventive, an anti-harassment policy must be "comprehensive, well-known to employees, vigorously enforced, and provide[] alternate avenues of redress." Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997).

33

CSXT argues that, during the period when Mr. Killebrew sexually harassed Ms. Taylor, it had an anti-harassment policy which satisfied this circuit's reporting requirements.  The court agrees.  The policy defined sexual harassment, gave specific examples of sexual harassment, and set forth a statement that retaliation would not be tolerated.  Furthermore, the policy provided alternative means for a victim to report sexual harassment and, importantly, did not require the victim to complain to the offending supervisor.  (Policy (Ex. 5 to Doc. No. 155)); Walton, 347 F.3d at 1286 ("At a minimum," the complaint procedure must be "'designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor.'") (quoting Faragher, 524 U.S. at 806 (alteration in original) (citations omitted)).

Furthermore, CSXT contends that it publicized the policy to Ms. Taylor by posting it in a crew room, where Ms. Taylor's job took her on a regular basis, and on its intranet to which Ms. Taylor had access.  Ms. Taylor does not dispute that CSXT "published" its policy, as she admits that "it is readily apparent that [CSXT] did have a mechanism in place in the form of a published policy to address harassment."  (Ms. Taylor Br. at 19 (Doc. No. 155).)  Indeed, as Ms. Taylor states (see id. at 14), when she finally reported the harassment to Mr. Montgomery, she did so in accordance with CSXT's procedures which "indicates that she knew exactly how to put the policy into action."  Madrid v. Amazing Pictures, No. Civ. 99-1565, 2001 WL 837922, at *10 (D. Minn. July 23, 2001). Ms. Taylor, however, argues that the policy was not preventive because CSXT engaged

in a practice of permitting or, at least tolerating, sexual harassment and, thus, failed to enforce its own policy.  (Ms. Taylor Br. at 19-21); (see also Ms. Taylor Aff. ¶ 2.)

Ms. Taylor is correct that, in addition to publishing an anti-harassment policy with effective reporting mechanisms, an employer must "demonstrate[] a commitment to adhering to [its] policy" in order for the policy to be found to be preventive, Farley, 115 F. 3d at 1554, and, similarly, the policy must not be administered "in bad faith."  Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1299 (11th Cir. 2000).  In Miller, for example, the Eleventh Circuit held that the employer's policy was ineffective, in part, because "company practice indicate[d] a tolerance towards harassment[.]"  277 F.3d at 1280.

In support of her argument that CSXT tolerated widespread harassment, Ms. Taylor provides two examples of Mr. Killebrew's conduct at the office.  First, Ms. Taylor states that, during the investigation of her sexual harassment complaint against Mr. Killebrew, CSXT learned that Mr. Killebrew had on one occasion made a sexually inappropriate remark to another female worker.  (Ms. Taylor Br. at 20-21 (Doc. No. 155)); (Ex. 9 to Doc. No. 155).)  However, because Mr. Killebrew's inappropriate remark to this employee comprised a single incident which that employee never reported to anyone at CSXT, (Ex. 9 to Doc. No. 155)), there is no evidence from which it can be inferred that CSXT was on notice that Mr. Killebrew had made the comment.  Absent constructive or actual notice to CSXT of this incident, CSXT cannot be said to have permitted or tolerated its occurrence.  See Thomas v. BET Soundstage Rest., 104 F.

Supp.2d 558, 568 (D. Md. 2000) (in context of analyzing Ellerth/Faragher affirmative defense in light of plaintiff's asserted fears, observing that "an employer may be charged with constructive knowledge of sexual harassment, even if unreported, if the harassment was so broad in scope, and so permeated the workplace, that it must have come to the attention of someone authorized to do something about it") (citing Young v. Bayer Corp., 123 F.3d 672, 674 (7th Cir. 1997)).

Second, Ms. Taylor points out that Mr. Killebrew's screensaver on his office computer depicted a "semi-clad" female. (Ms. Taylor Aff. ¶ 3); (Ex. 2 at 5 (Doc. No. 155)); (Ms. Taylor Br. at 1, 20 (Doc. No. 155).) There is no dispute that CSXT required Mr. Killebrew to remove the screensaver during the course of its investigation of Ms. Taylor's sexual harassment complaint. (Ex. 2 at 5 (Doc. No. 155).) Ms. Taylor, though, responds that CSXT should have been aware of the screensaver prior to her complaint because "management personnel were regularly in and out of the office where [] Mr. Killebrew had his computer." (Ms. Taylor Aff. ¶ 3.) The court finds, however, that this isolated instance, which the court does not condone, even if considered in conjunction with Mr. Killebrew's alleged inappropriate, but lone and unreported, statement to another employee, simply is insufficient to demonstrate the existence of a persistent practice of tolerating harassment. See Miller, 277 F.3d at 1280; cf. Starrett v. Wadley, 876 F.2d 808, 820 (10th Cir. 1989) ("isolated and sporadic acts of sexual harassment directed at a few specific female members of [the] staff" does not amount to a "persistent and widespread practice").

Significantly, there is no evidence that reports of sexual harassment resulted in no action or inadequate action by CSXT such that it could be said that management condoned or approved sexual harassment within CSXT's workplace.  The record is devoid of any evidence that CSXT did not take seriously accusations of sexual harassment or that any complaints of sexual harassment went uncurbed.  In fact, Ms. Taylor has submitted a CSXT document indicating that one sexual harassment complaint lodged by an employee resulted in the termination of a CSXT manager, thus, evidencing the seriousness of CSXT's stance against sexual harassment in the workplace.  (See Letter (Ex. 2 to Doc. No. 155)); contrast Madison v. IBP, Inc., 257 F.3d 780, 795-796 (8th Cir. 2001) (although employer had corporate policy prohibiting discrimination and harassment, there was no evidence that policy was enforced at the plant at issue, where management did not investigate or remedy a substantial number of complaints); Dysert v. Whirlpool Corp., 167 F. Supp.2d 967, 973 (N.D. Ohio 2001) (evidence was adduced that department where alleged harassment occurred had "a sign reading 'sexual harassment will not be tolerated, but will be graded'"); Finn-Verburg v. New York State Dep't of Labor, 122 F. Supp.2d 329, 334 (N.D.N.Y. 2000) (denying summary judgment on employer's affirmative defense because employee presented evidence that other female employees complained of sexual harassment to no avail and that those females were retaliated against for filing complaints).

Finally, the court observes that Ms. Taylor asserts in brief, and repeats almost verbatim in her affidavit, that her workplace was "permeated with sexual content and

inappropriate comment was expected."  (Ms. Taylor Aff. ¶ 2); (Ms. Taylor Br. at 19

(Doc. No. 155).)  Other than referencing the two incidents discussed above, Ms. Taylor

has not provided factual details of any other conduct, has not described the conduct's

sexual nature, has not indicated whether the "inappropriate comment" was even sexual in

nature, and has not identified any individual who engaged in the conduct.  Without

further description, the court cannot ascribe evidentiary value to Ms. Taylor's general and

conclusory assertions.  See Fed. R. Civ. P. 56(e) (requiring a plaintiff to "set forth

specific facts showing there is a genuine issue for trial") (emphasis added); see also

Duffy v. Leading Edge Prods., Inc., 44 F.3d 308, 312 (5th Cir. 1995) ("conclusory

allegations unsupported by concrete and particular facts will not prevent an award of

summary judgment"); Zigmund v. Foster, 106 F. Supp.2d 352, 356 (D. Conn. 2000)

("The mere verification by affidavit of one's own conclusory allegations is not sufficient

to oppose a motion for summary judgment."); Eng v. Beth Israel Medical Ctr., 93 Civ.

3605, 1995 WL 469704, *5 (S.D.N.Y. Aug. 7, 1995) ("Without supplying actual

examples of discrimination, 'conclusory allegations of discrimination are insufficient' to

defeat a motion for summary judgment.").  In short, Ms. Taylor has not produced any

evidence that CSXT generally tolerated sexual harassment or did not take seriously

allegations of sexual harassment.

        The court's analysis of the first prong of the affirmative defense, however, is not

over.  As stated, the first prong also requires CSXT to establish that it exercised

reasonable care to correct promptly sexual harassment.  See Bryant, 2005 WL1669596,

*2.  The Ninth Circuit has observed that "[t]he most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified."  Swenson v. Potter, 271 F.3d 1184, 1193 (9th Cir. 2001).  By doing so, "the employer puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace."  Id.

Here, the evidence establishes that the very day Ms. Taylor lodged her complaint with Mr. Montgomery, the wheels of CSXT's investigation were put in motion.  On the same Thursday that Ms. Taylor relayed her complaint to Mr. Montgomery, Ms. Hill, a human resource employee in the Jacksonville, office, interviewed Ms. Taylor over the telephone regarding her complaint of sexual harassment.  (Ms. Taylor Dep. at 61-63); (Ms. Taylor Aff. ¶ 6.)  The next Monday, less than two business days after Ms. Taylor reported the harassment, Ms. Arthur, the EEO manager from Jacksonville, was on-site at Ms. Taylor's workplace in Montgomery, interviewed 16 individuals, including Mr. Killebrew, and impressed upon the interviewees the confidential nature of the investigation.  (Ms. Taylor Dep. at 181); (Ex. 2 to Doc. No. 155.)  Ms. Arthur also reviewed relevant documents, including time sheets which confirmed an overlap in Ms. Taylor's and Mr. Killebrew's schedules.  (Ex. 2 to Doc. No. 155.)  There is no indication that from the time Ms. Taylor complained, CSXT acted other than quickly to begin and complete its investigation.  In fact, Ms. Taylor has not refuted that CSXT conducted an immediate investigation of her allegations.  Nor has Ms. Taylor challenged the ultimate

finding of CSXT's investigation which concluded in her favor and confirmed the truth of her accusations against Mr. Killebrew.  She also has not disputed that the harassment stopped when Ms. Taylor reported it.

Ordinarily, if the employer's response is sufficient to stop the alleged sexual harassment, there is no basis for imposing liability against the employer and no ground upon which to complain about the degree of severity of the sanctions imposed.  See Walton, 347 F.3d at 1288 ("where the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow"); Farley, 115 F.3d at 1555 ("Although Farley remains unsatisfied with ACIPCO's resolution of her complaint, we have never stated . . . that a complainant in a discrimination action has a right to the remedy of her choice.").

Ms. Taylor, however, complains that, even though the harassment halted, CSXT still can be held liable.  Specifically, she contends that the harassment ceased only because CSXT placed such restrictive conditions as to when she could work, prohibiting her from working on either Mr. Killebrew's shift or Mr. Yow's shift, that she never had any contact with Mr. Killebrew again.  Ms. Taylor contends that the restrictions on her work hours, in effect, punished Ms. Taylor by leaving her in a less advantageous position than before she complained about Mr. Killebrew's sexual harassment.  (Ms. Taylor Aff. ¶ 14.)

The court agrees with Ms. Taylor that evidence that an employer's remedy which places the victim in a worse position than the one she was in prior to lodging a sexual harassment complaint is evidence that the employer does not take appropriate corrective

action.  See Hostetler v. Quality Dining, Inc., 218 F.3d 798, 811 (7th Cir. 2000) ("A

remedial measure that makes the victim of sexual harassment worse off is ineffective *per

se.*  A transfer that reduces the victim's wage or other remuneration, increases the

disamenities of work, or impairs her prospects for promotion makes the victim worse

off.").  Having carefully considered the evidence in the light most favorably to Ms.

Taylor, however, the court finds that the fact that one of CSXT's remedies affected Ms.

Taylor's work schedule, rather than Mr. Killebrew's, is insufficient to present a jury

question as to the reasonableness of CSXT's response to Ms. Taylor's complaint of

sexual harassment.  The only evidence in the record indicates that Ms. Taylor received

full compensation for the hours which CSXT was unable to schedule Ms. Taylor for

work.  CSXT, thus, made financial arrangements for Ms. Taylor which ensured that she

did not lose any money that she otherwise could have earned had she not notified it of

Mr. Killebrew's inappropriate behavior.  Cf. Nash v. Electrospace Sys., Inc., 9 F.3d 401,

404 (5th Cir. 1993) (employer's response to employee's sexual harassment complaint was

sufficient as a matter of law where, although employee's allegations of harassment could

not be corroborated during employer's investigation, employee was transferred to another

position, with no loss of pay or benefits, so as to separate her from her alleged harasser).

As discussed previously, Ms. Taylor has not presented any evidence establishing or even

suggesting that the reduction in her work hours had any negative impact on her

employment with CSXT.  There simply is no evidence to support a finding that the

remedy contained the punitive element of which Ms. Taylor complains.

41

Considering the totality of CSXT's swift measures imposed to address the harassing behavior, which included stripping Mr. Killebrew of all supervisory duties and specific directions to Mr. Killebrew to avoid all contact with Ms. Taylor, and the absence of evidence that Ms. Taylor was deprived of any job benefit as a result of the restriction on her work hours, the court finds as a matter of law that CSXT's response to her sexual harassment complaint was adequate.  The court, thus, concludes that CSXT has satisfied the first element of the affirmative defense by demonstrating that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior."  Faragher, 524 U.S. at 807.

The second prong of the Ellerth/Faragher defense requires the employer to demonstrate that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807.  The Supreme Court has commented that proof of a failure by the employee to use a complaint procedure "will normally suffice to satisfy the employer's burden" on the reasonable care to avoid harassment element.  Faragher, 524 U.S. at 807-08.  In Walton, the Eleventh Circuit held that an employee did not exercise reasonable care by waiting nearly three months to report a supervisor's sexual harassment, which included repeated alleged sexual assaults.  See 347 F.3d at 1290. Because there was no evidence that the alleged harasser ever told the plaintiff that "her job was in jeopardy" or "threatened her with physical harm," the court concluded that the

plaintiff's fears were merely subjective and did not excuse her failure to "avail herself of the protections afforded by [the employer's] anti-harassment policies."  Id.

Here, it is undisputed that Ms. Taylor did not invoke CSXT's complaint procedures for more than six months, a length of time which Walton has established is unreasonable.  Generally, an unreasonable failure by an employee to invoke the employer's complaint procedure "will . . . suffice to satisfy the employer's burden under the second element of the defense."  Ellerth, 524 U.S. at 765.

Ms. Taylor, though, contends that her failure to use the policy is excusable for three reasons.  First, she contends that her initial reluctance to report Mr. Killebrew's behavior was due to the fact that she had "just started the job."  (Ms. Taylor Aff. ¶ 4.) Ms. Taylor has not explained how her status as a new employee caused her to fear reporting the harassment.  Giving Ms. Taylor the benefit of the argument, the court assumes that she is contending that she feared reprisal and/or feared that CSXT would not believe her allegations (see, e.g., Ex. D at 14 (Doc. No. 150)), but finds that these reasons are not well founded.

In Walton, the Eleventh Circuit rejected an argument that the plaintiff's subjective fear of reprisal excused her failure to report the harassment.  See 347 F.3d at 1290-91. The court explained that "[s]ubjective fears of reprisal may exist in every case, but . . . those fears, standing alone, do not excuse an employee's failure to report a supervisor's harassment."  Id. at 1291; see also  Leopold v. Baccarat, Inc., 239 F.3d 243, 246 (2d Cir. 2001) ("A credible fear must be based on more than the employee's subjective belief.

43

Evidence must be produced to the effect that the employer has ignored or resisted similar

complaints or has taken adverse actions against employees in response to such

complaints."); Hill v. Am. Gen. Fin., Inc., 218 F .3d 639, 643-44 (7th Cir. 2000)

(employee's subjective fears of confrontation, unpleasantness, or retaliation do not

alleviate the duty to notify her employer of alleged harassment).  Similarly, "[a]n

employee's subjective belief in the futility of reporting a harasser's behavior is not a

reasonable basis for failing to take advantage of any preventive or corrective

opportunities provided by the employer."  Barrett v. Applied Radiant Energy Corp., 240

F.3d 262, 268 (4th Cir. 2001).

Ms. Taylor has failed to explain how she legitimately feared retaliation,

particularly given that CSXT's anti-harassment policy specifically forbid retaliation

against employees who lodged sexual harassment complaints.  (Policy (Ex. 5 to Doc. No.

155).)  She has not produced any evidence that CSXT ever took any retaliatory action

against a complainant, in contravention of its policy's explicit command.  The absence of

such evidence undermines her argument that her fears had any objective component.[18]

Moreover, as discussed in the previous section, there is no evidence that, notwithstanding

_____

[18] Relatedly, the court notes that the protection afforded employees by Title VII's
express prohibition against retaliation yet is another reason "courts have refused to
recognize a nebulous 'fear of retaliation' as a basis for remaining silent."  Barrett, 240
F.3d at 267 (citing among others Madray v. Publix Super Mkts., Inc., 30 F. Supp. 2d
1371, 1375 (S.D. Fla. 1998), aff'd, 208 F.3d 1290 (11th Cir. 2000)).  "The bringing of a
retaliation claim, see 42 U.S.C.A. § 2000e-3(a) (West 1994), rather than failing to report
sexual harassment, is the proper method for dealing with retaliatory acts."  Matvia v. Bald
Head Island Mgmt., Inc., 259 F.3d 261, 270 (4th Cir. 2001).

CSXT's policy which expressly forbid workplace sexual harassment, CSXT, in reality, permitted or turned a blind eye to incidents of sexual harassment in the workplace.

Second, Ms. Taylor contends that her personal vulnerability, arising from adverse childhood experiences, contributed in part to her delay in reporting the harassment. The court, however, cannot accept this argument as a valid basis for relieving her of her obligation to timely report sexual harassment. Focusing on Ms. Taylor's fears emanating from a personality trait not only injects a wholly subjective and unmeasurable factor into the analysis, but ignores this circuit's mandate that the fear must flow from an apprehension of how the employer will react to the complaint. Walton, 347 F.3d at 1290; see also Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2nd Cir. 1999) (employee's reluctance to report acts of sexual harassment "must be based on apprehension of what the employer might do").

Third, Ms. Taylor asserts that her fear cannot be deemed "subjective" because she says that another worker at CSXT likewise feared reprisal. (Ms. Taylor Br. at 20-21.) Ms. Taylor points to the notes taken by Ms. Averitte when she interviewed the employee, referenced above, who stated that Mr. Killebrew once had made an inappropriate sexual remark to her. The court, however, finds that the evidence which Ms. Taylor cites (Ex. 9 to Doc. No. 155), at best, reveals that this particular employee was reluctant to participate in the investigation, not that she feared a retaliatory act from CSXT if she reported the incident. Nonetheless, even if a fear of reprisal could be gleaned from that employee's statement, that fear is just as subjective and generalized as Ms. Taylor's and, therefore,

fails to provide objective corroboration for Ms. Taylor's conclusory assertion of fear.  See Howard v. City of Robertsdale, No. 03-00770, 2006 WL 304552, *4 (11th Cir. Feb. 9, 2006) (unpublished) (holding that employee's delay in reporting sexual harassment was unreasonable where she asserted only "conclusory allegations" that "both she and other police personnel were scared of [harasser's] violent nature" and that "she feared retaliation").

In sum, the court finds that Ms. Taylor's asserted fears lack the required concreteness to survive a motion for summary judgment, as there is no objective evidence to substantiate those fears.  The evidence simply is too conclusory and speculative to overcome the unreasonableness of her six-month delay in reporting Mr. Killebrew's harassment.  The court, therefore, concludes as a matter of law that Ms. Taylor is not excused from waiting six months to use CSXT's anti-harassment complaint procedure and that, therefore, she failed to avail herself of the preventive or corrective opportunities provided by CSXT.  Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765.  Accordingly, the court finds that no reasonable jury could conclude that CSXT failed to establish the second prong of the affirmative defense.  Summary judgment, therefore, is due to be entered in favor of CSXT on the basis of the Ellerth/Faragher affirmative defense.

## 2.  *Retaliation* (Count III)

Title VII also prohibits retaliation against employees who voice opposition to discrimination through the filing of an EEOC charge or otherwise voice opposition to

alleged discriminatory employment practices.  See 42 U.S.C. § 2000e-3(a) (providing that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he [or she] has opposed any practice made an unlawful employment practice by this subchapter . . .").  The applicable test for considering whether Ms. Taylor has established a claim of Title VII retaliation, based upon her reliance on circumstantial evidence, follows the McDonnell Douglas burden-shifting formula.  See 411 U.S. 792 (1972).  To demonstrate a prima facie case of retaliation, Ms. Taylor must show that (1) she engaged in protected activity, (2) an adverse employment action occurred and (3) a causal link exists between the protected activity and the adverse action.  See Griffin v. GTE Florida, Inc., 182 F.3d 1279, 1281 (11th Cir. 1999).  If she produces evidence sufficient to make out a prima facie case, a presumption arises that CSXT unlawfully retaliated against her in taking the alleged adverse employment actions. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Next, CSXT must rebut the presumption of a retaliatory motive by producing evidence that the negative employment actions were motivated instead by legitimate, nondiscriminatory reasons.  See id. at 509.  CSXT's "burden is one of production, not persuasion; 'it can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr., 509 U.S. at 509). Finally, to avoid summary judgment, Ms. Taylor must respond with evidence, which may include previously produced evidence establishing a prima facie case, which would allow a reasonable jury to conclude that the reasons given by CSXT were not the real reasons

47

for the adverse employment decisions.  See Combs, 106 F.3d at 1528; see also Reeves, 530 U.S. at 143.

In light of the foregoing principles, looking first to the elements of the prima facie case, the court observes that it is undisputed that Ms. Taylor engaged in a protected activity when she complained of sexual harassment to her superior, Mr. Montgomery. See Rollins v. State of Florida Dept. of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989) (protection of Title VII anti-retaliation provisions extends to employees who informally voice complaints to supervisors or use employer's internal grievance procedure).  Moreover, having considered Ms. Taylor's brief as a whole, the court concludes that Ms. Taylor is complaining that she was subjected to adverse, retaliatory employment actions when CSXT limited the number of hours she could work, suspended her without pay and, ultimately, terminated her employment.[19]  These employment decisions are the same ones upon which Ms. Taylor relied to assert that she was subjected to tangible employment actions as a result of her failure to accede to Mr. Killebrew's sexual demands.  The court's discussion as to whether these actions rose to the level of

_____

[19] In the "argument" section of her brief, Ms. Taylor does not reference her suspension and termination as acts she deems retaliatory.  Although it is not the court's function to define a plaintiff's claims, for the sake of thoroughness, the court includes these two employment decisions in its discussion of Ms. Taylor's Title VII retaliation claim, as Ms. Taylor has alluded to their retaliatory nature in the "facts" section of her brief and in her Complaint.  (Ms. Taylor Br. at 11-12 (Doc. No. 155)); (Compl. ¶¶ 16-17); see also Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment" and that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

48

tangible employment actions, therefore, applies equally here, see supra, footnote 10.[20]

For Ms. Taylor, this means that the reduction in her hours, immediately following her

complaint of sexual harassment, is not an adverse employment action because she

received full compensation and presented no evidence that she suffered any other job

detriment as a result thereof.  Her suspension without pay after her arrest and her

termination, however, are adverse employment actions.

On the issue of causation, which Ms. Taylor is required to demonstrate as part of

her prima facie case, she relies only on temporal proximity.  (See Ms. Taylor Br. at 24

(Doc. No. 155).)  The court, however, finds, as with her claim of sexual harassment, that

the presence of intervening events, as well as Ms. Taylor's lack of any other evidence

showing or suggesting causation, negates a finding that a genuine issue of material fact is

created solely on the basis of temporal proximity.  Namely, the court finds that Ms.

Taylor's arrest eliminates any causal link between the protected conduct and her

suspension without pay and ultimate termination.  See Gubitosi, 154 F.3d at 33 (evidence

of intervening events undermines any inference of retaliatory motive and weakens the

causal link); see also Wu, 321 F. Supp.2d at 1337 ("any inference of retaliatory intent

otherwise created by a short lapse of time can be dispelled when intervening factors are

---

[20] The court notes that, to the extent if any that Ms. Taylor contends that the notice she received from CSXT advising her of the initiation of a "formal investigation" relating to her absence from work on October 17, 2003, is an adverse employment action (see Ms. Taylor Br. at 155 at 24 (Doc. No. 155)), the court disagrees.  As Ms. Taylor admits, the charge was "eventually dropped" and resulted in no negative employment consequence to Ms. Taylor.  (Ms. Taylor Aff. ¶ 10.)

established") (collecting cases).  An employer who learns of potential unlawful conduct

committed by one of its employees or of a work rule violation should not have to refrain

from taking investigative and disciplinary action merely because the employee also

recently engaged in protected conduct.  As to her termination, the court also reiterates

that there is no evidence Mr. Kovar knew that Ms. Taylor had complained of sexual

harassment by Mr. Killebrew when he reviewed the transcript from her formal

investigation and decided to terminate her.  See Raney, 120 F.3d at 1198 (to establish

causal link, employee must demonstrate that decisionmaker "was actually aware of the

protected expression at the time [her or she] took the adverse employment action") (citing

Goldsmith, 996 F.2d at 1163).

Alternatively, for the same reasons articulated by the court in Section V.A.1(a) of

this opinion, the court finds that Ms. Taylor has failed to rebut CSXT's legitimate, non-

retaliatory reasons for its employment decisions so as to raise a genuine issue for trial as

to pretext.  There is no evidence that CSXT's reduction in Ms. Taylor's work hours,

following her complaint of sexual harassment, was motivated by retaliatory animus.  As

discussed in the previous section, the only evidence in the record demonstrates that CSXT

separated Ms. Taylor from Mr. Killebrew to prevent the harassment and that it provided

compensation for the hours it was unable to schedule her for work.  Although Ms. Taylor

contends that the better course would have been for CSXT to restrict Mr. Killebrew's

hours, there simply is no evidence that CSXT's decision had a punitive component.

Furthermore, the evidence establishes that Ms. Taylor was suspended without pay

because she had been arrested and that she was terminated because she pleaded guilty to a crime.  The two other employees whom Ms. Taylor complains were treated more favorably are not adequate comparators for purposes of raising a jury issue as to pretext because there is no evidence that neither was convicted of the crimes for which they were charged.  See Silvera, 244 F.3d at 1259 (discussing requirements for proper comparator for purpose of raising inference of illegal discrimination).

In short, the court finds that Ms. Taylor has offered no evidence (1) that CSXT's proffered reasons have no basis in fact, (2) that the proffered reasons did not actually motivate the employment decisions, or (3) that the alleged reasons were insufficient to motivate the employment decision.  See Holston v. The Sports Auth., Inc., 136 F. Supp.2d 1319, 1338 (N.D. Ga. 2000).  The failure of Ms. Taylor to demonstrate that any of CSXT's reasons are a pretext for retaliatory animus also is fatal to Ms. Taylor's Title VII retaliation claim.  Summary judgment, therefore, is warranted because Ms. Taylor has failed to present evidence sufficient to invoke the protections of Title VII's anti-retaliation provision.

### B.  42 U.S.C. § 1981

The jurisdictional paragraph of Ms. Taylor's Complaint, as well at the relief section thereof, cites not only Title VII, but also § 1981.[21]  (Ms. Taylor Compl. At 1, 3-4.)  Neither Ms. Taylor nor CSXT has analyzed the interplay between these two statutes.  Rather, Ms. Taylor and CSXT have briefed Ms. Taylor's sexual harassment and retaliation claims as if Title VII and § 1981 provide parallel remedies for the federal causes of action alleged herein by Ms. Taylor.  Notwithstanding the lack of analysis by the parties,  the court finds that some discussion is warranted.

First, to the extent that Ms. Taylor's Complaint may be read to include a sexual harassment claim pursuant to § 1981, that claim is not viable.  See Mowery v. Escambia County Utilities Auth., No., 3:04cv382, 2006 WL 327965, *22 (N.D. Fla. 2006) ("It is well established that sexual harassment is not actionable under Section 1981.");  see also McCoy v. Johnson Controls World Servs., Inc., 878 F. Supp. 229, 232-33 (S.D. Ga. 1995) (citing Runyon v. McCrary, 427 U.S. 160, 167 (1976)).

Second, the Eleventh Circuit has observed that "whether the elements of Title VII and § 1981 retaliation claims are the same is an 'open question' in this Circuit."  Bass v. Board of County Com'rs, Orange County, Fla., 256 F.3d 1095, 1120 n.10 (11th Cir. 2001) (citing Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1463 n.4 (11th Cir. 1998)).  In

---

[21] Although the reference to "42 U.S.C. § 1983" in the jurisdictional paragraph of Ms. Taylor's Complaint appears to be a scrivener's error, the court observes that 42 U.S.C. § 1983 requires state action, an element wholly missing in this case.  See Lowe v. Aldridge, 958 F.2d 1565, 1672 (11th Cir. 1992) (expounding upon § 1983's state action requirement).

Olmstead, the court noted that it was unclear whether § 1981 supports a retaliation claim when the retaliation "is not based upon the race of the complainant." Olmstead, 141 F.3d at 1463 n.4 (citing Little v. United Technologies, 103 F.3d 956 (11th Cir. 1997)). The issue of CSXT's liability for retaliation under § 1981 has not been raised by the parties. Assuming *arguendo* the applicability of § 1981, the court finds that Ms. Taylor's failure to raise a genuine issue of material fact for trial on her Title VII retaliation claim obviates the need for the court to decide whether Ms. Taylor can bring a corresponding retaliation claim under § 1981. See Miller v. Bed, Bath & Beyond, Inc., 185 F. Supp.2d 1253, 1274 (N.D. Ala. 2002) (observing that "while there is some doubt in this circuit regarding the elements and scope of retaliation claims under § 1981, . . . suffice it to say that the Court concludes that its determination that Plaintiff has failed to show an adverse employment action for purposes of a Title VII retaliation claim also forecloses such a retaliation claim under § 1981"). Summary judgment, therefore, is due to be entered in favor of CSXT on Ms. Taylor's § 1981 claims.


C.  Supplemental State Law Claim (Count IV)

Having dismissed the federal claims, the court in its discretion declines supplemental jurisdiction over the remaining state law claim in Count IV. See 28 U.S.C. § 1367(c)(3); see also McCulloch v. PNC Bank, Inc., 298 F.3d 1217, 1227 (11th Cir. 2002). CSXT's motion for summary judgment on the state law claim, therefore, is due to

be denied as moot, and the state law claim is due to be dismissed without prejudice.  <u>See</u>

28 U.S.C. § 1367(c)(3) & (d).


## VI. ORDER

Accordingly, it is CONSIDERED and ORDERED as follows:

(1) CSXT's motion for summary judgment (Doc. No. 150) be and the same is

hereby GRANTED to the extent that Plaintiff Shonita L. Taylor's federal claims in

Counts I, II and III are hereby DISMISSED with prejudice; and

(2) CSXT's motion for summary judgment be and the same is hereby DENIED as

moot on Plaintiff Shonita L. Taylor's supplemental state law claim in Count IV and the

state law claim be and the same is hereby DISMISSED without prejudice pursuant to 28

U.S.C. § 1367(c)(3).

A judgment in accordance with this Memorandum Opinion and Order shall be

entered separately.

DONE this 6th day of March, 2006.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE